The United States Court of Appeals for the Fifth Circuit is now open according to law. The United States Court of Appeals for the Fifth Circuit is now open according to law. Good morning, Your Honors. May I please support Barry Fleischman for Realpage, the policyholder in this case. I'd like to reserve five minutes for rebuttal. Your Honors, Realpage contends that the undefined term, property you hold for others, reasonably can apply to electronic funds whose movement was solely and exclusively under the control of Realpage. This is especially true here, where Realpage was responsible under a written contract and as an agent to collect funds from residents of properties and convey those funds, transfer those funds to the owners of those properties. Realpage contends that its interpretation of the words you hold for others is reasonable under the policy, under the facts, and is consistent with case precedent. I have a question. I didn't see this in any of the briefing. Is the term premises defined anywhere? Yes, Your Honor. Both the term premises and the term banking premises are defined in the policy. If I could refer, Your Honors, to page 50 of the appellate record, which is page 12 and 14 of the insurance policy. There's the definition of banking premises, which means the interior of that portion of any building occupied by a banking institution or similar safe depository. But is the word, it says premises and or banking? Yeah, premises is on page 52 of the record, page 14 and 14 of the policy. Premises means the interior of that portion of any building you occupy in conducting your business. And Your Honors, the location of the insured property when it's stolen is a material part of this contract. If Your Honors compare the computer fraud coverage, which is one part of the commercial crime coverage, with the funds transfer fraud coverage, we are seeking coverage under the computer crime coverage. And there, the property needs to be inside the premises or banking premises. If you look at the funds transfer fraud coverage, that property needs to be in, quote, your transfer account. Your, meaning the policyholders, transfer account. And if you look at the definition of transfer account, which is on page 52 of the record, page 14 and 14 of the policy, transfer account means an account maintained by you. So if location was material and it is material to these coverages, this policy says for the transfer, the funds fraud, the money, the funds need to be in your account. But if it's computer fraud, the funds merely need to be in a banking institution. And what the insurance companies are trying to do in this case is to add the words your account to the computer fraud coverage. In essence, that's their argument. They're saying possession means you have to hold it in your account. Well, that's potentially applicable to the funds transfer fraud coverage, but the words your account don't appear in the computer fraud coverage. It merely means banking premises, and that's exactly where the money was stolen from. RealPage had sole and exclusive control over the movement of the money. The bank couldn't move it. The residents couldn't move it. The owner couldn't move it. Only Stripe could move it. Well, Stripe could give the command to move it, but only if RealPage told Stripe to do it. Stripe could not move it on its own. That was delegated to Stripe under the party's contract, wasn't it? Yes, but Your Honors, the relationship between Stripe and RealPage doesn't change the relationship and the chain of control that Stripe had with the owners and the residents. There was no relationship between the residents and the owner with Stripe. They delegated RealPage to have control over the movement. That's how this was all secure. That's how this relationship could work. It could only work if RealPage had control. That's belied by the fact that RealPage's person screwed up the relationship, right? The bad agent used the control of RealPage because that was the only control that mattered. It was a phishing deal, was it not? Yes. Which means that some outside bad person stole the credentials or stole access to the RealPage computer, right? Yes. They stole access to the RealPage computer, which, for purposes of our case here, means they stole RealPage's control over that money, and that's the only way that the money could move. Your Honors, you're all familiar, I believe, in this circuit with the applicable rules that apply to contract interpretation for insurance policies. The policy term is used in the context of the whole policy, which is why the reference to the your account words in those two coverage provisions is so important, and in the relevant industry. Here, it's in the electronic funds industry. This is not the movement of paper dollars from this hand to this hand. It's the pushing of buttons and the use of electronics to control the movement of funds through the electronic banking system. If there is more than one reasonable interpretation, the term is ambiguous. RealPage's interpretation doesn't need to be the best. It doesn't even need to be better than any other interpretation. It only needs to be not unreasonable. So, go back to this. The critical language is property you hold for others. Yes. And the word hold is not defined. And this court, in its precedent in Cooper Industries, that talks about, well, what does hold mean? What are the features of ownership and holding something? And in Cooper Industries, this court recognized that possession or control are both features of owning or holding something. Well, counsel, what you say, you say owning or holding, but owning is a separate category under this policy. You could have owned the funds, leased the funds, or had some leasehold in them or possessed them, right? Hold them, I guess. Correct. But if we go with the definition of hold, as the district court did, where possession is the key thing, RealPage's didn't possess these funds, correct? Your Honor, the features of possession and holding have different meanings in different contexts. The court in the Russell case, the appellate court in Texas, for example, that court talked about an implied bailment. And that court said that possession means the, I'm sorry, this is the Cedar Lake case in Oregon, quoting the appellate court in Oregon, saying that possession, I'm going to get the exact quote for it so I don't get it wrong, possession is defined to include the intent to exercise control over the goods. This is the appellate court in Oregon. And one of the features of contract interpretation in this circuit is the favoring uniformity, attempting to get uniformity. But counsel, back to the point, RealPage has never possessed these funds. It's Stripe. Stripe had the funds in Stripe's account, correct? Your Honor, the funds were in the account, but I would take it. But it was Stripe's account. It was Stripe's account. It was RealPage's account. Yes, but it was controlled. Stripe couldn't do anything with those funds. Well, I guess here's my opening question, and I want you to tell me how I'm wrong about this. I mean, to me this seems almost like settlement instructions or wiring instructions that a third party would provide to a lender, for example. If the closing attorney says, I want this check, that check, and the other check sent to these recipients, unless the attorney holds those funds in an escrow or trust account in the law firm, the attorney doesn't hold those funds, right? The bank does. How's this different? Number one, this is an insurance policy. I got it. But how's this different as far as holding the funds in question? Because if you can't do anything with the funds, you don't necessarily hold them. If I control everything about those funds, where they can go, and if I am under a written contract where it's my responsibility under contract to move those funds from here to there, and I am the only one with that responsibility, and I have a contractual requirement to do it, and I'm an agent for my customer to do it, then I am holding those funds. Nobody else does. Nobody else can complete that business transaction. Is you defined in the policy? You as the policyholder. Correct. So property, the policyholder holds for others. And it could have easily said property, you or your agents hold for others. That's correct, Your Honor. But it's up to the insurance. But it didn't. But it's up to the insurance company, particularly where you're dealing with a limitation or exclusion of coverage, to make the policy clear. And here, the insurance company made it absolutely clear. They said, when you're dealing with funds transfer fraud, the money, the funds need to be in your account. If they had that requirement for the computer fraud coverage, they should have said so. They can't come back now and say, well, instead of any banking premises and no reference to your account, we're going to graft onto that language that it needs to be in your account. I'm not sure I understand physically what happened. On page 8 of your brief, you're describing it. And did money move from a bank account of the residence into Stripe's account and then somewhere else? Or did Stripe just facilitate the transfer from the renters directly from their bank accounts to RealPay, or in this case, to the fraudsters? Your Honor, Stripe essentially is a pipeline. The resident pushes a button on its screen that says, make the payment, either through a credit card or a direct account. That is an order for the money to move through the system to the landlord. Physically, the money went through to a Stripe account in a bank. And when it was given the command by RealPay, the money moved from that account to the account it was directed to by RealPay. Stripe didn't know who to give the money to. Stripe didn't know how much to give. Was this instantaneous, or did Stripe hold it for days? It's virtually instantaneous because of the electronic function. But it does go physically to a Stripe account? Your Honor, that gets into the issue of debits and ledgers and clearinghouses. The physical dollars don't move. It's all done electronically, and then it's... But Stripe had an account that was credited. You're not. I mean, I'm asking. Stripe has the account in the bank. The money comes out of the Stripe account to the owners upon the command and the instructions of RealPay. If RealPay does not give any instructions, that money cannot move anywhere. Your Honor, I talked about Cooper Industries, talking about the features of ownership and holding include control separate from possession. I talked about the Cedar Lake case in Oregon, which makes the same point, that possession is defined to include the intent to control. I need to talk a minute about the Lynch case because the distinctions between this case and Lynch further support RealPay's argument. In Lynch, the money was in the principal's account, and it was taken out. I see my time is up. If Your Honors don't have any questions or if you'd like me to continue, I will. Otherwise, I'll save it for rebuttal. You said time for rebuttal. Thank you. Thank you, Your Honors. Good morning. May it please the Court. The National Union Commercial Crime Policy covers property that the insured owns, and it covers property that the insured holds for others. The controlling policy language cannot be stretched to cover property that is owned by the insured's clients and held by a third party. My name is Kristen Kelly, and I represent National Union, the insurer for the primary policy. Mr. Riddle represents the insurer, Beasley, for the excess policy. But because the National Union policy has to exhaust before the Beasley policy is triggered, I'll argue for the first 15 minutes, and he'll take the last five. As the Court's well aware, RealPage, as the insured, has the burden to show that there's coverage under the specific language of the policy, and only then does the burden shift to the insurer to show that an exclusion might exist to preclude coverage. But RealPage did not meet its burden. First, a condition precedent to recovery under the policy is that RealPage must either hold or hold for others the property for which it's making a claim. RealPage concedes that it did not own the relevant funds. This dispute is about whether RealPage held those funds for others. And as the Court has indicated, RealPage cannot show, the record shows that RealPage did not hold the funds. RealPage merely facilitated the tenant's payments to its clients by providing payment instructions to Stripe. Stripe actually collected the funds. Stripe held the funds in Stripe's bank account. Stripe commingled those funds with other funds that it held in its account for other merchants. And then Stripe delivered the funds directly to RealPage's clients, but unfortunately in this case to the hacker's bank accounts. The agreement between Stripe and RealPage states that RealPage has no rights or interest in the funds in Stripe's bank account or the bank account itself. As the District Court recognized, the funds that are maintained in a commingled account in a third party's name at a third party bank, which the insured can direct but not access, are not funds held by the insured. Counsel, what about Counsel Lopez's argument, the distinction between computer fraud versus a regular loss or some other form of loss? I mean, are they right about the policy terms being different and about the insurers trying to graft on and basically compare apples to oranges? Can you talk a little bit about that? I think the policy language that pertains to this claim expressly says that it has to be owned or held. And it is clear that it was not held here. I understand the argument that this is a virtual transaction, but it still must have the ability to be accessed by RealPage, is what the lower court said. And that just was not the case here. In some instances, RealPage actually handles the process directly. RealPage has its own platform called RealPage. It's called the RealPage platform. It processes payments directly from the tenants to the client. And so in that case, they would control the whole process and hold the funds. But that's not what happened here. Here they elected to use a third-party stripe. This court has actually considered almost identical circumstances in the Lynch Properties case. Here it held that when an insured actually handles the property, which has far more than happened here, the property is not held. In that case, Lynch Properties argued that it held the funds because it held checks that were used to transfer the funds. Ms. Lynch, the accountant in that case, paid the insured to manage her property and perform bookkeeping. And part of the services that Lynch Properties performed for her is that they handled requests for spending money. And so in that case, the insured actually took a check, took it to an authorized signer on the account, which is Ms. Lynch's son, had the check signed, took the check to the bank, withdrew the funds, and then took the funds and either gave them to Ms. Lynch's assistant or to a courier to give them to her. And eventually, the insured started stealing money by drawing an extra check and then withdrawing the funds and then pocketing them. And the insured in that case argued that it held the misappropriated funds because it held those checks that were used to withdraw the funds, which is very similar to what RealPage is arguing here. RealPage says that because it held the credentials that the hacker used to access the strike portal and then change the transfer information, because it had that, it actually held the funds that were stolen by the hackers. But this court has already rejected that logic. Emphasizing the tenuousness of the connection between the insured and the misappropriated funds in that case, it explained that the insured's possession of the checks did not amount to holding the funds. And here, the connection is even more tenuous. RealPage never handled the stolen funds. It had no right to the strike bank account that held the funds. Its role was limited solely to providing instructions as to the transfer destinations in the strike portal. And like the insured in Lynch Properties, that authority existed only by authorization of a third party, which was its clients in that case. Similarly, in the Texas Association of School Board case, the Western District of Texas applied the Lynch holding, and it said that an insured did not hold funds that were stolen, where the insured actually had check-writing authority on the account that held the funds, but didn't have possession of the account. We urge the court to follow those cases and that sound logic in this case as well and find that RealPage did not hold the funds. But even if you take RealPage's argument and RealPage could rewrite the policy such that hold meant control, RealPage wouldn't have coverage for this loss because it didn't control the funds either. We don't contest that RealPage provided Stripe with certain information, but that information was not the property itself, and that's what the policy requires. The undisputed evidence shows that RealPage lacked control over the property. It could not independently move funds into or out of the Stripe bank account. It had no authority to access Stripe's bank account in any manner. It had no access to its clients' funds that were in the account, and it had no access to the funds that were ultimately due to it until Stripe actually released those funds to it. Tellingly, when the fraud was discovered, RealPage couldn't put a hold on the money or ask for Wells Fargo to freeze the account or otherwise stop the transfer. RealPage had to reach out to Stripe and wait for Stripe to do that. RealPage insists that, you know, they've argued in all the briefing that not a single penny of the client's funds could be moved without the instruction of RealPage, but that's not the relevant inquiry. The relevant fact is, or the dispositive fact, is that RealPage itself could not transfer or otherwise access a single penny of the funds. RealPage never owned the funds, it never possessed them, it never controlled or otherwise had any rights to the funds that Stripe was holding in Stripe's bank account. Counsel, you said something about Stripe in terms of recovering the funds and RealPage not having the ability to do that, but they were able to recover some portion of what was stolen, right? I mean, was that Stripe's action or was that RealPage's action? It was Stripe's action. The testimony shows that RealPage had to reach out to Stripe and ask Stripe to talk to Stripe's bank to pull back their money. And, Your Honor, there's a chart that's included in our briefing. I have a copy here if it would be helpful. The transaction can be made somewhat complicated, but it's actually very simple. And this is a chart that RealPage actually put into the record and it shows how the money did, in fact, go into the Stripe account and then was sent by Stripe to either RealPage clients or Stripe. Counsel, what about my analogy to the settlement instructions or closing attorney instructions? I mean, am I thinking about that in the right way? I think you are. So, basically, your position is that this is akin to settlement instructions or closing instructions that were given to someone that doesn't really impact on the whole question. Correct. There's also been some discussion about an agency arrangement between RealPage and its clients, but the important inquiry is that there was no agency relationship between Stripe and RealPage. The agreement between them actually disclaims an agency relationship and states that Stripe serves as an independent contractor. Similarly, RealPage has argued that there was somehow some sort of two-way bailment here and that this court has indicated that a bailment relationship is sufficient to establish that an insured held the properties for others. There are several problems with that argument. First of all, we think that that overstates this court's decision in Lynch. This court didn't determine that a party holds property when it has a bailment. It just generally acknowledged that a bailment is one way that an insured could hold funds. Ultimately, this court determined in that case that the insured had no bailment over the funds because just like here, the funds were never delivered to the insured and the funds were taken by the insured's employee with no intention of returning them. Also, possession, I mean, excuse me, bailment also requires possession, which is a hurdle that they cannot overcome. Also, there's no dispute that Stripe commingled the funds that it received into its account related to this transaction with funds that it held for other merchants. And we cite a case law that states that commingling funds in a general account is a bailment-destroying transfer. The bailment argument is also contingent on an agency agreement between Realpage and Stripe, which the record shows is incorrect. Just to respond to Realpage's argument about the Cooper case, that case does talk about ownership and what ownership means, but it didn't hold that mere control equates to ownership. In that case, the court rejected Cooper's claim that it retained equitable ownership of funds, that it was fraudulently induced a loan to someone else, and that the court considered the dictionary definition of own and explained that in insurance disputes, courts have to apply the common everyday definition of the word owns, which included possession. In the context of that discussion, this court said the obvious proposition that there cannot be ownership without possession or control, but it didn't say in the reciprocal that possession or control alone equals ownership. Similarly, the Cedar Lake case is a District Court of Oregon case. There's several critical distinctions in that case. The primary one is that in that case, the insured had a management agreement providing for the insured to be the sole account owner with exclusive authority to sign the checks and gave the clients no access over the accounts. Here it was Stripe, not Realpage, that was the sole account owner, and Realpage lacked exclusive authority to do anything with the funds in the Stripe bank account. The definitions that the parties offered have one unifying characteristic, and the District Court and the insurers agree that that characteristic is possession. The ability to provide information to facilitate the transfer of property without more is insufficient. In Mustang Tractor, this court stated that the context in which a word is used must control its definition, and the contextual sentences included with the definitions proffered by Realpage make clear that its reliance on those definitions is misplaced. Hold, as used in the policy and as commonly understood, means possession. So while the insurers have offered a reasonable definition of the word hold, Realpage has not. Just a point of clarification, if I have a little bit more time, I just want to make clear that the National Union did pay, did accept coverage for and paid for Realpage's direct losses under the property, and that was for the money that was owed to and owned by Realpage. National Union only denied coverage for the diverted funds that were intended for Realpage's clients and property management companies, and this dispute is about only those funds. Speak a little bit about that, counsel. To the extent that we get past hold and we say that Realpage has held the funds, just assume that for the purpose of this, do we still end up affirming based on the fact that this is an indirect loss? Is it a direct or indirect loss? Let's correct your honor. The relevant insuring agreements expressly limit coverage to direct losses, and Realpage's decision to reimburse its clients for their losses was a business decision that resulted in only an indirect loss to Realpage for which this policy does not cover. I thought the definition expressly said that you hold for others whether or not you were legally liable for the loss of such property. Let's correct your honor. So I'm not sure that helps you on the direct versus indirect distinction. So there's two different sections under the policy that they have to prove coverage. So the condition precedent is that they have to own or hold for others the property, and then the second in the insuring agreement discusses about coverage, and it says that we will only pay for direct losses. So the fact that they were not required to pay for that makes it an indirect loss to them. The Lynch Properties case and the Texas Association School Board case also speak to the issues of direct versus indirect loss. In TASB, the court explained that to be direct, a loss must be immediate and without intervening space, time, agency, or instrumentality. And the court explained that an insurer does not suffer a direct loss unless the insured assets, not those of a third party, are reduced directly by the wrongful conduct. Unless the court has any further questions, I will defer to Mr. Williams. I'm sorry. Your Honors, my name is John Riddle. I represent the Excess Carrier Beasley Insurance Company. And as you'll see from my argument that that's an important distinction in this matter, I want to make three points to the extent I have time. The first is that Beasley concurs in the presentation by Ms. Kelly on the overall issue of whether this is a covered loss. Beasley's position is, of course, that it's not. And the district court got it right in a well-reasoned opinion that basically considered all sides of the issues. The second thing I want to address is this claim that RealPage has asserted against my client only for anticipatory breach of contract. That's not the same thing as a simple breach of contract. And in the memorandum opinion, the district court granted summary judgment on all claims against both National Union and Beasley. It didn't expressly talk about that cause of action in any detail. But back in 2004, in Gonzales v. Denning, this court listed the elements of anticipatory breach of contract under Texas law as, first, an absolute repudiation of a contractual obligation, two, lack of a just excuse for that repudiation, and then three, damage to the non-repudiating partner. And Gonzales has been followed by numerous courts applying Texas law. And it's our position that our summary judgment evidence negated all three of the elements listed in Gonzales. To absolutely repudiate a party must, through words or actions, declare an unconditional intent not to perform the contract according to its terms. A good example of this would be where the insurance company says, hey, you misrepresented something in the application process, and we hereby declare this policy rescinded. So we're not going to honor it at all because we don't think it still exists or ever came into existence. It's a void admonition. That's an example of where you absolutely repudiate the contract. And it may or may not be justified, depending on the facts. But RealPage really failed to do anything to try to demonstrate that there was an absolute repudiation. They simply said, well, you didn't pay the claim. But that's not good enough under Texas law. In fact, National Union didn't even repudiate the policy. They paid more than a million dollars toward the part of the lawsuit it deemed was covered. And Beasley, rather than repudiating the excess policy, simply said, look, in light of National Union's partial denial of coverage, we're not going to issue a formal coverage opinion, but we're going to reserve our rights. And we never stated that the policy was not in effect or would not be honored. And it's long been the rule that in Texas, an insurer's mere denial of coverage for a claim submitted by an insurer is insufficient under Texas law to constitute a repudiation of the policy. That goes back, well, actually, in 2008 in Richardson v. American Bankers Insurance Company. This court made the statement that the U.S. Supreme Court long ago held that denial of a claim for benefits under an insurance policy does not constitute a repudiation. And if you go back in time quite a bit more, you go back to 1937, a commission of appeals opinion by the court basically announced a rule that a mere denial of coverage is not an absolute repudiation of the policy. And then this court followed. That was in a case called Sanders. And then the very next year, this court in Williams v. Mutual Benefit Health and Accident Association followed that. And then in 1947, the Texas Supreme Court confirmed that earlier Sanders rule. And so the bottom line is, as was stated in a 1965 Texas Court of Appeals decision, Continental Casualty v. Border, it's helpful also to remember what repudiation is not. A denial of the facts and title of the insurer's recovery under the policy is not a repudiation. So the bottom line is, there's no anticipatory repudiation here. And the reason that's important is, if this court does not affirm on the basis of what the district court held, that there was no holding of the funds by real page, which we believe is correct, then still the court can affirm and should affirm the judgment in Beasley's favor as to that cause of action for anticipatory repudiation. And then I would also note that the policy has not been exhausted by payment, so therefore our liability cannot arise. And in fact, exhaustion will not occur in this case because of the recoveries that the insurer has obtained. It will never get into the excess layer of coverage. And then finally, they did not demonstrate below or in their briefing in this matter that the court below erred in denying their motion for summary judgment. And in fact, they didn't even actually brief it. So we think that the court justified in denying that part of their appeal on the basis that they didn't even address it actually in their brief. Thank you. Your Honor, just quickly, Judge Wilson, you asked counsel to discuss the difference in the policy language, the specific language in the funds transfer fraud coverage specifying your transfer account and that language not being in the computer fraud coverage. I don't believe that question was answered directly, and I don't think there is an answer to that question. The insurance company is trying to put the words, your account, which are in the funds transfer fraud coverage, into the computer fraud coverage, and they simply aren't there. In terms of your question earlier regarding the settlement instructions to attorney, there is a distinction. When an attorney has settlement instructions, it is the attorney that goes and directs the bank. It is the attorney that can take and withdraw the funds directly upon the attorney's own discretion. Here, Stryke had no discretion whatsoever. Stryke got a direction from RealPage, and Stryke executed. Stryke didn't do any thinking. Stryke didn't do any discretion. Stryke couldn't do anything other than execute electronically without any thought process The instructions that it was given by RealPage, the party that had absolute control over those funds. In terms of the Lynch case, it's the distinctions of this case from Lynch that are important. In Lynch, when the funds were stolen, they were in the account of the principal. They were stolen out of the account of the principal through the use of the principal's signature. Here, the owner didn't have the money in the account, and the owner's signature wasn't required to move the money. RealPage had the power given to it by the owner to move the money. This is a very big distinction. In Lynch, there was no written contract between the principal and the agent to perform the business transaction. Here, there was a written contract where RealPage was designated as the agent for the specific and limited purpose of moving money from point A to point B electronically. In Lynch, the bad agent did not have the authority to move the funds. That's why the bad agent needed the principal to sign off. Here, RealPage had the authority on its own to move the funds. The owner didn't do anything. The resident didn't do anything other than place the money into RealPage's possession. But Stripe possessed the funds, counsel. In other words, RealPage didn't do anything either to effectuate the transfer. Stripe did that. And as I think Counsel Opposite said, there are other instances where RealPage handled those sort of back office functions, right? In which case, RealPage would have done the entire transaction. But all RealPage did here was basically collect its fee for providing the instructions which Stripe then effectuated. Your Honor, it just seems that you're conflating Stripe, RealPage, and you did what? With respect, Your Honor, possession means control. Can means control. And the case law supports that, both in Cooper Industries and in Cedar Lake. But what about Counsel's point that RealPage couldn't do anything to recoup any of the funds without Stripe's and Stripe's bank's actions in doing so? And Stripe couldn't do anything to try and get that money back unless RealPage gave it explicit instructions to do it.  No. RealPage did that through its express control and instructions to Stripe. Stripe had no authority to act on its own either. Stripe was merely a pipeline. And what basis do you have for saying that? I mean, I know factually RealPage undertook to recover the funds. But why do you say that Stripe could not have said, hey, wait a minute, these got diverted and we're going to try to get them back as quickly as possible? Because the business relationship between Stripe and RealPage was that Stripe responded to RealPage instructions. Stripe was not authorized to do anything on its own. So let's say Stripe had gotten a call from someone and said, we think that money has been fraudulently transferred out of your account. Stripe was perilous to do anything? I'm not sure that there is record evidence that would answer that question. The answer is that Stripe would go to RealPage and say, this is what happened, what do you want us to do? Your Honor, my time is up. If you have no further questions. Thank you. We have your argument served. Thank you very much. That will conclude the argument this morning. The court will reconvene tomorrow morning at 9 o'clock. All rise.